32 F.3d 569
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James HARRAH, Plaintiff-Appellant,
v.
Donna SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 93-3820.
 United States Court of Appeals, Sixth Circuit.
 July 27, 1994.
 
 Before: MILBURN and NELSON, Circuit Judges, and COOK, Chief District Judge.*
 PER CURIAM.
 
 
 1
 The Plaintiff-Appellant, James Harrah, appeals the final judgment of the District Court which denied his motion for summary judgment, granted a summary judgment in favor of the Defendant-Appellee, the Secretary of Health and Human Services ("Secretary"), and affirmed the Secretary's denial of Social Security Disability Insurance Benefits and Supplemental Security Income. On appeal, Harrah, inter alia, claims that the evidence does not support the Secretary's decision. For the reasons that have been set forth below, we affirm.
 
 
 2
 * In December of 1981, Harrah was laid off from his job. Notwithstanding his repeated efforts, he was unable to find alternative employment. In the fall of 1985, Harrah successfully completed a six to eight week park ranger course that had been offered to him by the Hocking Technical College. When his attempts to secure employment as a ranger proved to be unsuccessful and a feeling of discouragement with his lack of success persisted, he stopped looking for work.
 
 
 3
 On January 18, 1989, Harrah filed applications for disability insurance benefits and supplemental security income, claiming that he had been unable to work because of a congenital deformity in his left hand and a musculoskeletal strain in his right arm. Both of these applications were denied. His request for an administrative hearing was subsequently granted by the Secretary.
 
 
 4
 Thereafter, Administrative Law Judge (ALJ) Mark W. Haase conducted three hearings between April 25, 1991 and February 13, 1992. On March 12, 1992, ALJ Haase concluded that Harrah was not entitled to any disability benefits or supplemental security income. In reaching his decision, he found, among other things, that Harrah had suffered from a combination of impairments, including mild fibrositis, possible rheumatoid arthritis, a congenital left hand deformity, organic mental disorder, generalized anxiety disorder, personality disorder and dysthymia. However, the ALJ also found that Harrah (1) possessed the residual functional capacity to perform medium physical exertion with certain restrictions due to his deformed left hand, (2) was unable to complete complex job instructions, (3) retained the ability to perform his past work as a machine operator, cleaner and spray painter, and (4) possessed the ability to perform a wide range of available jobs, such as janitor, food preparer, dining room helper, guard, inspector, and cashier, considering his age (41 years), education (equivalent to high school), and residual functional capacity. After evaluating all of those factors, the ALJ concluded that Harrah was not disabled under the Social Security Act. The Appeals Council denied Harrah's request for a review, and in doing so, finalized the decision of the Secretary.
 
 
 5
 On September 25, 1992, Harrah filed a Complaint with the District Court, seeking a reversal of the Secretary's decision. After considering the parties' motions for summary judgment, the District Court concluded, inter alia, that there was substantial evidence to support the decision of the Secretary, notwithstanding the conflicts in the record. Harrah now appeals.
 
 
 6
 In his appeal, Harrah raises two arguments. He initially contends that substantial evidence demonstrates that his combined impairments rendered him totally disabled prior to December 31, 1986. In the alternative, Harrah requests that this case be remanded to obtain the testimony of an impartial medical advisor.
 
 II
 
 7
 A judicial review of the Secretary's decision is limited to determining if the administrative findings are supported by substantial evidence and whether the proper legal standards were employed when the decision was made. 42 U.S.C. Sec. 405(g) (1993); Wyatt v. Secretary of Health and Human Services, 974 F.2d 680, 683 (6th Cir.1992); Born v. Secretary of Health and Human Services, 923 F.2d 1168, 1173 (6th Cir.1990); Brainard v. Secretary of Health and Human Services, 889 F.2d 679, 681 (6th Cir.1989) "Substantial evidence" has been defined by this Court as "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might support as adequate to support a conclusion." Brainard, 889 F.2d at 681. In reviewing the issues on appeal, our scope of review is limited to an examination of the record because we must neither "review the evidence de novo, make credibility determinations nor weigh the evidence." Id.
 
 
 8
 Harrah has conceded that his physical impairment, when viewed separately from the other claimed ills, is not a disabling condition under the standards of the Social Security Act. Hence, this case will turn upon whether Harrah's mental impairments added significant limitations upon his ability to work which would preclude him from being able to perform any substantial gainful activity in the workplace.
 
 1. Harrah's Mental Impairments
 
 9
 In November of 1987, Charles Loomis conducted a work evaluation of Harrah. Notwithstanding Harrah's below average academic abilities as well as his poor ability in mathematical computations and low average understanding of scientific and mechanical concepts, he received competitive quality to satisfactory ratings on the bookkeeping, mail sorting, and machine operation tests. Moreover, it was Loomis' opinion that Harrah was physically capable of performing any type of work for which he could be trained.
 
 
 10
 On June 2, 1988, Allan B. Rain, a consulting psychologist, examined Harrah and described him as a man with an alcohol dependence in remission and a generalized anxiety disorder. Subsequently, Rain amended his report to note that Harrah should probably work in jobs with a relative degree of independence and a minimal amount of stress. In an organicity examination that was conducted on July 25, 1988, Rain opined that Harrah could be suffering from an organic mental disorder and personality disorder.
 
 
 11
 On June 15, 1989, the ALJ asked a state agency to conduct an evaluation of any mental impairment that Harrah may suffer, and strongly recommended a psychological evaluation and testing of his mental residual functional capacity and mental impairments, if any. In compliance with this request, the state agency sought and obtained additional medical information from Dr. Paul Harris who, in February of 1990, opined that Harrah (1) suffered from depression, asthmatic bronchitis, fibrositis, and rheumatoid arthritis, and (2) was unable to perform any work-related activities.
 
 
 12
 Dr. Marla D. Lake, having completed her examination of Harrah on February 20, 1990, found that he was able to understand most of her instructions and was capable of functioning adequately in his daily life.[2] Lake also observed that Harrah did not have any apparent difficulty in maintaining his attention and was able to satisfactorily perform all of his assigned tasks during her evaluation of him. She ultimately concluded that he did not appear to have any significant psychiatric problems.
 
 
 13
 Two months later, Dr. Robert L. Turton, a psychiatrist, surmised that Harrah may be suffering from mental retardation, anxiety related disorder and substance addiction disorders. However, he found no evidence of organic, mental, psychotic, affective, somatoform, or personality disorders. Turton reported that Harrah's existing disorders, while often affecting an ability to concentrate, only slightly limited his daily living activities and social functioning. It was Turton's belief that Harrah's understanding, memory, and adaption were not significantly limited, and his sustained concentration, persistence, and social interaction ranged from "no significantly limited" to "moderately limited." Turton's final functional capacity assessment was that Harrah could (1) initiate and participate in those work activities that were independent of supervision and direction, (2) relate adequately, and (3) understand and maintain a level of concentration that was sufficient to complete his assigned tasks in a timely manner.
 
 
 14
 On April 21, 1991, Dr. Beal D. Lowe, a psychologist, reviewed all of the available medical records, interviewed Harrah, and subsequently administered several psychological tests to him. Harrah was later diagnosed by Lowe as suffering from an organic mental disorder, a generalized anxiety disorder, dysthymia, and a personality disorder with psychological stresses and serious difficulties in social and occupational functioning. On the basis of these findings, Lowe concluded that Harrah had a mild impairment in his daily living activities and social functions, a moderated impairment in his concentration, persistence and pace, and a marked impairment in his ability to adapt to stressful condition in a work setting, all of which began to develop in December of 1981. Given these impairments, Lowe believed that Harrah did not have the capacity to sustain day-after-day performance in a work-like setting.
 
 
 15
 On May 3, 1991, Rain completed a mental residual functional capacity assessment of Harrah. In Rain's opinion, Harrah suffered from concentration problems that were not included in Turton's earlier report. It was his judgment that Harrah was markedly limited in his ability to understand, remember, maintain attention and concentration for extended periods of time and carry out detailed instructions. He also found Harrah to be moderately limited in his ability to remember short, simple instructions, and to complete a normal work day and work week without interruption. He also expressed some concern about Harrah's ability to interact with the general public, his peers and co-workers, and to respond to changes in the work environment.
 
 
 16
 Loomis examined Harrah once again on September 23 and 24, 1991 for the purpose of completing his work evaluation. He noted that, although Harrah's performance was consistent with his first evaluation (to wit, below average academic performances and poor understanding of mechanical concepts), it was not acceptable for those tasks which involved production quotas. Based on these observations, Loomis concluded that Harrah would be able to perform such jobs as a security guard, cleaner/janitor, kitchen helper and parking lot attendant. He rated Harrah as "good" in his ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, understand and carry out non-complex instructions, behave in an emotionally stable manner, related predictably in social situations, and demonstrate reliability. The only "fair" mark that Harrah received from Loomis related to his ability to understand, remember, and carry out complex job instructions.
 
 2. Vocational Evidence
 
 17
 During the first supplemental hearing on December 20, 1991, the ALJ heard testimony from Dr. Samuel Osipow who had been given an opportunity to review the evidence and question Harrah. Osipow, when asked by the ALJ to assume that (1) Harrah was within the normal range of physical capabilities with the exception of his left hand and (2) he possessed the mental limitations that had been attributed to him by Loomis, opined that Harrah had the ability to return to his former jobs as a machine operator, cleaner, or spray painter, or work as a janitor, a dining room helper, food preparation, guard, and inspector. However, when presented with a second hypothetical question by the ALJ in which he was asked to assume that Harrah possessed the same mental limitations in Lowe's report, Osipow was of the view that the combination of those impairments could preclude him from working.
 
 
 18
 Finally, in responding to an inquiry by the ALJ who sought to determine whether psychological testing or a work evaluation would more accurately reveal an individual's ability to concentrate, perform at production levels that are expected by employers, remember locations and workday procedures, and respond to his peers and coworkers, Osipow opined that the first three factors are better evaluated in a work simulation setting and the last by psychological testing.
 
 
 19
 During a second supplemental hearing on February 12, 1992, Loomis ratified his earlier opinion with regard to Harrah's ability to perform work, with the exception of bookkeeping as a possible vocational opportunity. He asserted that his opinion was based upon an examination of several court-related documents, including Rain's psychological report, as well as his observations of Harrah's dress, demeanor, and ability to complete an assignment.
 
 
 20
 Although the record indicates directly opposing viewpoints with regard to Harrah's ability to perform work, this Court will not attempt to resolve these conflicts in the evidence. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984); see also McCann v. Califano, 621 F.2d 829, 832 (6th Cir.1980) (resolution of conflicting medical testimony not function of appellate court). Rather, it is the Secretary who "is charged with the duty to weigh the evidence [and] to resolve material conflicts in the testimony." Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir.1990). If they are supported by substantial evidence, the Secretary's findings are conclusive. 42 U.S.C. Sec. 405(g).
 
 
 21
 Here, Lake's psychiatric report, Loomis' work evaluation and the vocational expert testimony in combination with all the medical evidence regarding Harrah's physical limitations support the Secretary's determination that his impairments were not disabling. Even Turton, who recognized the presence of a severe impairment which did not meet the listing requirements, concluded that Harrah was able to relate, understand, and concentrate adequately to complete tasks in a timely manner notwithstanding the moderate limitations that were outlined in his report.
 
 
 22
 Harrah does not challenge Loomis' qualifications as a licensed psychologist who is capable of assessing an individual's mental residual functional capacity. Rather, Harrah maintains that the ALJ accorded an inappropriate level of credence to Loomis whom he claims had failed to examine all of the pertinent psychiatric and psychological evidence prior to completing his assessment and evaluation.[3]
 
 
 23
 Initially, the Court notes that Loomis, in his capacity as a vocational rehabilitation evaluator, was obliged to make an independent judgment of Harrah's work capabilities. However, there is no similar obligation upon a witness, such as Loomis, to fulfill his obligation by examining all of the evidence in the record. The judicial officer before whom the evaluation is presented must make a determination as to the level of credibility that will be assigned to the witness' testimony.
 
 
 24
 Furthermore, with the exception of the 1991 Rain report, the documents that were not reviewed by Loomis were merely cumulative or not favorable to Harrah.[4] While Loomis may not have had all of the test results in his possession, he did consider the substance of all relevant evidence.[5]
 
 
 25
 Next, Harrah challenges the legitimacy of Loomis' assessment of the medical reports upon which the ALJ relied in part. It is his position that Loomis failed to perform the requisite tests and interview. Loomis' instructions for a medical assessment provided, in pertinent part:
 
 
 26
 To determine this individual's ability to do work-related activities on a day-to-day basis in a regular work setting, please give us an assessment--BASED ON YOUR EXAMINATION--of how the individual's mental/emotional capabilities are affected by the impairments(s). Consider the medical history, the chronicity of finds (or lack thereof), and the expected duration of any work-related limitations, but not the individual's age, sex, or work experience.
 
 
 27
 (J.A. 403.) Contrary to Harrah's representations, Loomis' assessment was to be based upon the work evaluation that he was directed to perform--not upon any medical or psychological evaluations. Moreover, he considered Harrah's medical history, including the substance of the findings by Rain, Harris, and Turton. While psychological tests and mental status evaluations may be useful tools in assessing a person's ability to perform work functions, they do not represent the exclusive methods of evaluation. The ALJ specifically determined that no additional psychological examination should be conducted because of the then-recently completed evaluation by Lowe. The only requirement that had been placed upon Loomis by the ALJ was to consider and assess Lowe's findings, an obligation that he subsequently satisfied.
 
 
 28
 Finally, Harrah submits that Loomis' conclusions were refuted by Osipow who opined that an individual with same test results, such as those in Loomis' second evaluation, would not be able to function competitively in production or manual skill jobs. This argument overlooks the opinion of Osipow who expressed the view that an individual with the same limitations would be able to work as a machine operator, clearner, spray painter, janitor, dining room helper, assistant in food preparation, guard, and inspector. Loomis' belief that Harrah would be able to perform such jobs as a security guard, cleaner/janitor, kitchen helper and parking lot attendant is consistent with Osipow's testimony.
 
 
 29
 The law obligates an ALJ to review the medical evidence pursuant to the dictates of 20 C.F.R. Sec. 404.1527 (1993). These regulations mandate that the ALJ weigh the evidence when the testimony is inconsistent: "[i]f any of the evidence in your case record, including any medical opinions(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have." Id. at (c)(2).[6] However, a physician's opinion is not conclusive of the claimant's disability. Miller v. Secretary of Health and Human Services, 843 F.2d 221, 224 (6th Cir.1988); Landsaw v. Secretary of Health and Human Services, 803 F.2d 211, 213 (6th Cir.1986); Houston v. Secretary of Health and Human Services, 736 F.2d 365, 366 (6th Cir.1984). An ALJ can give less weight to a medical opinion if it is not based upon detailed clinical and diagnostic test evidence. See Miller, 843 F.2d at 224; Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir.1985). In any event, the ultimate determination of disability is the prerogative of the Secretary. Landshaw, 803 F.2d at 213.
 
 
 30
 Due to the lack of objective medical evidence to support his findings, Rain's opinion (to wit, Harrah was "brain damaged")[7] was rejected by the ALJ. Similarly, the ALJ did not give credence to Lowe's conclusions because his findings were based solely on Rain's earlier diagnosis. The Court believes that the ALJ properly accorded the Rain and Lowe testimony with less weight than the other opinion evidence in the record.
 
 
 31
 Resolving conflicts of evidence and weighing of evidence are tasks that are committed to the discretion of the Secretary. See Garner, 745 F.2d at 387. In light of the ALJ's thorough review of the entire record and his articulated reasons for rejecting the evidence that had been advanced by Rain, the ALJ did not err when he gave substantially greater weight to the Loomis testimony.[8] For these reasons, the Court finds that the ALJ properly relied upon Loomis' work evaluation in reaching his final decision. In addition, the Court determines that substantial evidence supports the finding that Harrah was not disabled.
 
 III
 
 32
 In the alternative, Harrah contends that the Court should remand this matter to the ALJ for the medical testimony from a vocational witness who, in his opinion, would be impartial. The Secretary opposes the request, arguing that Harrah never raised this issue at the administrative level or in the district court and, hence, he should be barred from doing so now. It is axiomatic that issues that have not been presented for administrative or district court review are not appropriate for consideration by an appellate court. See Harper v. Secretary of Health and Human Services, 978 F.2d 260, 265 (6th Cir.1992); Young v. Secretary of Health and Human Services, 925 F.2d 146, 149 (6th Cir.1990) (citation omitted); Davis v. Secretary of Health and Human Services, 915 F.2d 186, 189 (6th Cir.1990).
 
 
 33
 Although Harrah has consistently argued that his due process rights were violated by the ALJ's consideration of Loomis' testimony, it appears that he never presented his request for remand to the ALJ or the district judge. He points to an April 9, 1991 letter to the ALJ, in which he requested the testimony of a medical and vocational expert. (J.A. 45.) However, there was no suggestion or contention by Harrah in the letter that the testimony up to that date had been biased. Because the remand issue was not raised below, it is not properly before this Court for consideration.
 
 IV
 
 34
 Accordingly, the judgment of the District Court is AFFIRMED.
 
 
 
 *
 The Honorable Julian Abele Cook, Jr., Chief United States District Court Judge for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 During the examination, Harrah advised Lake that he used the following medications: Clorazepate (for nerves), Nolamine (for allergies), Xanax (to relax), Prozac (for depression), Temazepam (for sleep), and Tagament and Clinoril (for pain), all of which he found to be helpful. Harrah also stated that he does his own grooming, some shopping and minor household chores, and watches television during the day
 
 
 [3]
 Loomis testified that he reviewed, among others, the 1988 Rain reports, the 1990 Harris report, the 1990 Turton psychiatric report, and the 1991 Lowe report prior to conducting his 1991 work evaluation. He also considered such raw data, as the IQ scores that were calculated by Rain. However, Loomis acknowledged that he had not examined the Lake report, the Turton psychiatric review and mental residual functional capacity assessment, the Davies report, the 1991 Powers physical assessment, or the 1991 Rain mental residual functional capacity assessment
 
 
 [4]
 Lake concluded that Harrah did not have any diagnosable psychiatric disease. Turton's psychiatric review and mental residual functional capacity reached the same results as those reports that were in Loomis' possession. In addition, Dr. James J. Power's 1991 physical assessment indicates that Harrah was physically capable of performing most work-related activities. Similarly, Dr. Dwight H. Davies' residual physical functional capacity assessment reiterates that Harrah's physical limitations were due to his deformed left-hand
 
 
 [5]
 In his work evaluation report of Harrah, Loomis recorded the following disability and limitations:
 Established medical impairments included an organic mental disorder, generalized anxiety disorder, depression, a personality disorder with dependent and inadequate features, rheumatoid arthritis, fibrositis and asthmatic bronchitis. Restrictions placed upon the applicant by the state medical consultants suggest a functional capacity for at least Light work activity.
 (J.A. 396.)
 
 
 [6]
 Evidence from nonexamining physicians and psychologists is considered opinion evidence. 20 C.F.R. Sec. 404.1527(f)
 
 
 [7]
 The ALJ wrote:
 [M]r. Rain's comment that the claimant was "brain damaged" based on the Memory For Design test appears inconsistent with the claimant's prior work record, as Mr. Loomis' testimony made clear, and the claimant had no organic brain injury or other event to suggest that his ability to deal with and remember shapes had lessened since his successful work activity.... Mr. Rain's reports appear to be based in significant part on the claimant's questionable self reports.... Similarly, complaints of pain and fatigue voiced to Mr. Rain were not noted during the recent consultative examination or during the work evaluations.
 (J.A. 27-28.)
 
 
 [8]
 The ALJ declared:
 As for the claimant's capacity to withstand the mental demands of work activity, I accept the assessment by Mr. Loomis at Exhibit 67. Although Mr. Loomis performed vocational evaluations on the claimant rather than a battery of psychological tests in arriving at his conclusion, Mr. Loomis is a licensed psychologist who is a [sic] capable of assessing an individual's mental residual functional capacity. Moreover, I believe that conclusions as to the claimant's ability to meet the mental demands of work activity can be drawn by a professional such as Mr. Loomis based on actual work simulation and observation. In any event, Mr. Loomis took account of the results of psychological testing done by others in assessing the claimant from a vocational standpoint.
 * * *
 The opinion of Mr. Loomis is persuasive in this case because he had the opportunity to evaluate the claimant on two different occasions in a true work-like setting over an extended period of time. In addition, he took into account the test results of other examination mental health professional. Significantly, the claimant's mental status was so lacking in any abnormalities that one of the consulting mental health professions, Dr. Lake, was unable to find any diagnosable mental impairment.
 (J.A. 27-28.)